UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
A.G. and J.G., on behalf of J.G., a student with    :
a disability,    :
                      Plaintiffs,    :          **OPINION AND ORDER**
    :
  v.    :         16 CV 1530 (VB)
    :
BOARD OF EDUCATION OF THE    :
ARLINGTON CENTRAL SCHOOL    :
DISTRICT,    :
                    Defendant.    :
------------------------------------------------------------x

Briccetti, J.:

       Plaintiffs A.G. and J.G. (collectively, "Parents") bring this action against the Board of

Education of the Arlington Central School District (the "District") pursuant to the Individuals

with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, et seq.  Parents seek

judicial review of a decision by a State Review Officer ("SRO") at the New York State

Education Department, who found that the District offered Parents' child, J.G., a free appropriate

public education ("FAPE") for the 2013-2014 and 2014-2015 school years,[1] and denied Parents'

request for tuition reimbursement.

       Pending before the Court is Parents' motion for summary judgment.  (Doc. #17).  For the

reasons set forth below, the motion is DENIED.  The SRO's decision is affirmed in all respects.

       The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

---

[1]      Parents argued before the IHO and SRO that the District also failed to provide J.G. a
FAPE for the 2012-2013 school year, but as explained below, that issue is not currently before
the Court.

**BACKGROUND**

I.      Statutory Framework

The IDEA was enacted to promote the education of disabled children.  20 U.S.C.

§ 1400(d)(1)(A); see Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S.

176, 179 (1982) (interpreting predecessor statute to IDEA).  States receiving public funds are

required to provide a FAPE to children with disabilities.  20 U.S.C. § 1412(a)(1)(A).  Public

school districts must provide "'special education and related services' tailored to meet the unique

needs of a particular child, [which are] 'reasonably calculated to enable the child to receive

educational benefits.'"  Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998)

(quoting Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 207).

States have an obligation under the IDEA to identify, locate, and evaluate "[a]ll children

with disabilities residing in the State" to determine whether they require special education and

related services.  20 U.S.C. § 1412(a)(3)(A); see Handberry v. Thompson, 446 F.3d 335, 347 (2d

Cir. 2006).  This so-called "child find" obligation extends to children who are "suspected of

being a child with a disability."  34 C.F.R. § 300.111(c)(1).

The IDEA requires states to create an individual education plan ("IEP") for each disabled

student.  See 20 U.S.C. § 1412(a)(4); see also Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d

356, 363 (2d Cir. 2006) ("The key element of the IDEA is the development of an IEP for each

handicapped child.").  The IEP is a "comprehensive statement of the educational needs of a

handicapped child and the specially designed instruction and related services to be employed to

meet those needs."  Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 368 (1985).

If the state fails to provide a FAPE to a disabled child, the parents may enroll the child in

a private school and seek reimbursement for the cost of the private school from the local board of

education.  See 20 U.S.C. § 1412(a)(10)(C); Sch. Comm. of Burlington v. Dep't of Educ., 471

U.S. at 369-70, 374.

In New York, parents seeking such reimbursement must first file a due process complaint

challenging the appropriateness of the IEP.   FB v. New York City Dep't of Educ., 923 F. Supp.

2d 570, 577 (S.D.N.Y. 2013).  An impartial hearing officer ("IHO") conducts a hearing on the

parents' complaint.  See N.Y. Educ. Law § 4404(1).  A board of education is required to

reimburse parents for private educational services if: (1) the board fails to establish the student's

IEP provided a FAPE; (2) the parents establish their unilateral placement was appropriate; and

(3) equitable considerations favor the parents' claim.  See Florence Cty. Sch. Dist. Four v.

Carter, 510 U.S. 7 (1993); M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d 131,

135 (2d Cir. 2013).  The IHO's decision may be appealed to an SRO.  See N.Y. Educ. Law §

4404(2); see also 20 U.S.C. § 1415(g).  The SRO's decision may be challenged in federal court.

See 20 U.S.C. § 1415(i)(2)(A).

II.     Factual Background

The parties have submitted briefs, statements of material facts pursuant to Local Civil

Rule 56.1, and the record and exhibits from the proceedings below, which reflect the following

factual background.

J.G., who was born in 2004, suffers from several "academic deficits," primary among

them dyslexia, and in particular difficulty with "[d]ecoding and encoding" words.  (Parents' SOF

¶ 6; Parents' Br. at 1).

J.G. was first evaluated and determined to have a learning disability in February 2009,

when he was in preschool.   However, on May 29, 2009, the District's Committee on Special

Education ("CSE") determined J.G. was "no longer eligible for special education."  (IHO Ex. 1

at 2).[2]  Approximately one year later, on April 29, 2010, the District determined J.G. was again eligible for special education services.  (Dist. Ex. 3).  Each year thereafter the CSE—made up of various District employees, including special education teachers, therapists, and psychologists—held meetings attended by its members and one or both of J.G.'s parents, to develop an IEP for the relevant academic year.  (Dist. Exs. 6-12).  At issue here are J.G.'s IEPs for his fourth and fifth grades, i.e., the 2013-2014 and 2014-2015 school years.  J.G. attended a public school, Beekman Elementary School, in the 2013-2014 school year, and attended a private school, Kildonan, in the 2014-2015 school year.

A.   May 23, 2013, CSE Meeting and Resulting IEP

The CSE met on May 23, 2013, to develop an IEP for the 2013-2014 school year.  In pertinent part,[3] the meeting notes state "[i]ndividual academic testing shows [J.G.] is in the below average range in reading and writing, with weaknesses in word reading and spelling." (Dist. Ex. 9 at 57).  The notes further state, "[i]n the classroom, [J.G.] is working hard on decoding words and encoding them correctly when spelling," and that he "works well with his support."  (Id.).

In addition, the May 23, 2013, IEP states, among other things, that "[a]ccording to a Fountas and Pinnell benchmark reading assessment given in May, [J.G] is currently reading at instructional reading level N.  In September, [he] was reading at instructional level H.  [He] still decodes many words when he is reading, but is able to maintain great comprehension."  (Dist.

---

[2]   Citations to the record herein follow the labeling and numbering of the exhibits as they were made part of the record.  The IHO and District Exhibits are numbered and Bates-stamped; the pin cites refer to the Bates-stamped page number.

[3]   The IEPs include notes on other areas of J.G.'s education, including Math, Writing, and Physical Development, but the focus of this appeal is on his reading, writing, decoding, and encoding abilities.  Accordingly, this summery focuses on those aspects of the IEPs only.

Ex. 9 at 62").    The IEP further states that J.G. "needs a multi-sensory approach, to improve his decoding and encoding skills," and "additional sight word practice."  (Id.).

The IEP lists eleven annual goals, including three in reading: (i) "[w]hen given a list of multi-syllabic (many syllables) words (e.g. transformation, purposeful), [J.G.] will decode the words"; (ii) "[w]hen given reading material, [J.G.] will read a paragraph or story out loud with appropriate expression and fluency"; and (iii) "[J.G.] will listen to a teacher presented story or read a story independently and will answer comprehension questions related to the story that require inferencing." (Dist. Ex. 9 at 65).  With respect to writing, the stated goals are: (i) "[w]hen given an assignment with incorrectly spelled words, [J.G] will identify the spelling errors and correctly spell each word."; (ii) "[J.G.] will compose a paragraph of 7 sentences that are clear, complete and grammatically correct"; and (iii) "[J.G.] will write a report or essay that is logical, sequential and includes topic sentences and details."  (Id.).  For each of these goals, the "measure to determine if goal has been achieved" is "80% success over 10 weeks."  (Id.).

The resulting May 23, 2013, IEP also provided that J.G. would receive ten hours of Integrated Co-teaching Services ("ICT") per week, and two and a half hours of "Resource Room Program," with a five-to-one student-teacher ratio.  (Dist. Ex. 9 at 57, 66).

B.    March 27, 2014, CSE Meeting and Resulting IEP

The CSE met again on March 27, 2014, and "agreed to complete an Assistive Technology consultation to gain deeper understanding on relevant reading technological tools to assist" J.G.  (Dist. Ex. 10 at 69).  In addition, "the completion of the CONNORS attention rating scale was recommended to assess his attention levels."  (Id.).  The CSE also held an annual review at this meeting and developed an IEP for March 31, 2014 to June 24, 2014.  (Dist. Ex. 10A; Tr. at 70).

In the comments section, this IEP states:

> It was reported that [J.G.] is benefiting from the support of his program.  His sight word recognition has improved and his confidence in writing is increasing rapidly.  He benefits from writing tools to organize his thoughts.  [J.G.]'s comprehension and understanding is strong.  Decoding continues to be an area of need.  In the classroom, [J.G.] continues to work on decoding sight words and encoding them correctly when spelling.

(Dist. Ex. 10A at 210).

With respect to J.G.'s academic achievement in reading, the March 27, 2014, IEP states, "[a]ccording to the Fourth Grade Progress Report, [J.G.] is below grade level standards in Reading Fluency, Literature Analysis, and Word Analysis," and "approaching grade level standards in Reading Comprehension and Vocabulary Development."  (Dist. Ex. 10A at 214).  In addition, it notes, "[J.G.] has made gains in his ability to decode one syllable and multi-syllabic words," and "[h]e benefits from using the context of his reading along with phonetic cues to help him decode words.  His strong vocabulary is an asset in this process, as well as his persistence." (Id.).  It further notes, "[J.G.] has increased his ability to recognize words by sight"; "[h]e is able to read all of the First 300 Fry words"; and "[t]he pace at which he learns new words is increasing as well."  (Id. at 214-15).  With respect to his reading level, the IEP notes J.G. "was able to read a Level N, nonfiction text with 98% accuracy," but "[h]is fluency remains weak." (Id. at 215).

This IEP further states J.G. "needs continued practice decoding more difficult words," and "[h]e needs additional practice using context cues along with phonics cues to help him decode at a quicker pace, as well as more accurately."  (Dist. Ex. 10A at 215).  The "Measurable Annual Goals," in Reading in this IEP are: (i) J.G. "will persist in using both contextual and phonetic cues to decode unfamiliar words"; (ii) he "will annotate the text to guide his understanding, allow him to participate in class and small group discussions, and help him to

prepare for research reports"; and (iii) he "will read short passages with fluency and expression, paying attention to punctuation and the author's word choices." (Id. at 218). In writing, the goals are: (i) J.G. "will edit his writing to correct errors in capitalization, punctuation and spelling"; (ii) he "will write a multi-paragraph essay or story, using a designated or appropriate structure to convey clear meaning"; and (iii) "[w]hen given a writing task, [J.G.] will produce an amount of writing within the range of other fifth grade students." (Id.).

The resulting IEP provides that J.G. should receive two hours per week of Resource Room time and ten hours per week of ICT. (Dist. Ex. 10A at 210). In addition, this IEP states, "based on projected regression over the summer months the support of an extended school year program was recommended via Specialized Instruction-Consultant Teacher." (Id. at 211). Specifically, the IEP recommends a twelve-month program for two hours per day, two times per week, over the summer months, from July 7 through August 15, 2014. (Id. at 220).

According to at least one witness who testified before the IHO, Parents attended the March 27, 2014, meeting and that neither Parent "disagree[d] in any way." (Tr. at 76).

C.   May 13, 2014, CSE Meeting

By letter dated May 5, 2014, Parents informed the District they had "decided to get a second opinion and have a full evaluation done on [J.G.] outside of the school district." (Dist. Ex. 45). They requested a CSE meeting "as soon as possible to discuss this." (Id.).

On May 13, 2014, the CSE met again, and Parents attended. The meeting notes show the participants reviewed the "results of the recently complete[d] assistive technology consultation," and the CSE made certain recommendations based on those results. (Dist. Ex. 10B at 222). In particular, the meeting notes show that "the use of Bookshare, Write 10 and Read2go was recommended for [J.G.]'s program with implementation for the following school year." (Id.). In

addition, the "CSE also reviewed the results of the CONNERS rating scale, [and] the results correlate[] with the needs and levels reported by the parents and [J.G.]'s teachers." (Id.).

The May 13, 2014, meeting notes further reflect Parents "mentioned a request for an 'IEE-independent education evaluation,'" but that Parents "did not indicate what type of independent evaluation they were seeking," and "were not certain of the type of evaluation they are disagreeing with and requesting an IEE for." (Dist. Ex. 10B at 222). Furthermore, the notes reflect Parents "indicated that they are contemplating placement in a private school; the Kildonan School was reported as one of their considerations." (Id. at 223).

        D.    <u>June 10, 2014, CSE Meeting</u>

On June 10, 2014, the CSE reconvened "to review [J.G.]'s program and to address [J.G.]'s parents['] recent correspondence to the CSE." (Dist. Ex. 11 at 82). The meeting notes indicate J.G.'s father attended the meeting, and that he requested that "a Neuropsychological evaluation" be conducted on J.G. (Id.). The notes further reflect that the CSE agreed to have such an evaluation done. However, the record reflects Parents never gave the District consent to perform the evaluation, and instead paid for a private evaluation. (Tr. at 101-102).

The June 10, 2014, CSE meeting notes further indicate J.G.'s father "indicated concern over [J.G.]'s academic progress." (Dist. Ex. 11 at 82). The notes reflect that J.G.'s "educational team responded that this concern seem[ed] to contradict previous parental acknowledgment of [J.G.]'s progress," and that J.G. "began the year reading at a K/L level and as per his last record he is reading at an N level." (Id.). In addition, the notes reflect that J.G.'s father "reported discontinuation of medication for attention deficits," and that "[t]eachers reported that [J.G.] ha[d] been more distractible since that time." (Id.).

E.      Decision to Remove J.G. from Public School

By correspondence dated July 8, 2014, J.G.'s father informed the District that "[d]ue to the district's denial of my child['s] . . . right to a free appropriate public education, I am providing my written notice that 10 business days or more from the receipt of this email, I plan to remove my child from the public school and place him at Kildonan," and that he would "be seeking reimbursement for all costs associated with Kildonan."  (Dist. Ex. 49).

By letter dated July 11, 2014, the District confirmed receipt of Parents' letter and indicated it was "prepared to schedule a CSE meeting to review [J.G.]'s program."  (Dist. Ex. 50).

On July 28, 2014, Parents signed an enrollment contract with Kildonan for the 2014-2015 academic year.  (Parents' Ex. C).

F.      August 25, 2014, CSE Meeting and Resulting IEP

On August 25, 2014, the CSE held another meeting, attended by J.G.'s father, to develop J.G.'s IEP for the 2014-2015 school year.  The notes from this meeting state J.G.'s father "indicated that although he recognized that [J.G.] is making educational improvements as he develops, he is concerned about [J.G.]'s markings on his report card."  (Dist. Ex. 12 at 93).  With respect to the report card, J.G.'s teachers "emphasized that although a student might maintain a 2 [approaching grade level] . . . mark for consecutive marking periods, it is not a sign of lack of progress."  (Id.).  Instead, it "indicates that for each of the skills introduced or worked on during each marking period, the student was showing progress by approaching proficiency."  (Id.).  "It was also emphasized that the report card . . . is one of the measures utilized to determine goals and services," but "[n]o one document, in isolation, can comprehensively describe the individual as a whole."  (Id.).

The meeting notes further reflect J.G. "did not attend the recommended summer program," but that "a full neuropsychological evaluation was completed by Patricia Thomas over the summer," for which J.G. "attended weekly assessment sessions." (Dist. Ex. 12 at 93). However, "[n]o Neuropsychological evaluation report was provided for review," because J.G.'s father had not yet received it himself. (Id.). In addition, the notes reflect that J.G.'s father confirmed that J.G. would attend Kildonan for the 2014-2015 academic year. (Id.).

The meeting notes also show one of J.G.'s teachers reported that J.G. "began the 4th grade school year reading at a level K-L (third grade) and ended the year at level N (fourth grade)." (Dist. Ex. 12 at 94). The CSE discussed that [J.G.] "benefited from the support of the Wilson reading program (provided in the resource room)," and J.G.'s teacher indicated "that reading decoding is a skill that is better provided in context of a story." (Id.).

As a result of this discussion, the resulting August 25, 2014, IEP includes recommendations for J.G. to spend two hours and thirty minutes in the Resource Room every week with a five-to-one student-teacher ratio, in addition to ICT services in English, Math, Science, and Social Studies, and "Consultant Teacher Services (Specialized Instruction): Direct" two times per week for two hours in July and August 2014. (Dist. Ex. 12 at 93).

The "Measurable Annual Goals" in this IEP again contain three for reading, and three for writing. (Dist. Ex. 12 at 101). For reading, the goals are: (i) J.G. "will persist in using both contextual and phonetic cues to decode unfamiliar words"; (ii) J.G. "will annotate the text to guide his understanding, allow him to participate in class and small group discussions, and help him to prepare for research reports"; and (iii) J.G. "will read short passages with fluency and expression, paying attention to punctuation and the author's word choices." (Id.). For writing, the goals are: (i) J.G. "will edit his writing to correct errors in capitalization, punctuation and

spelling"; (ii) J.G. "will write a multi-paragraph essay or story, using a designated or appropriate structure to convey clear meaning"; and (iii) "[w]hen given a writing task, [J.G.] will produce an amount of writing within the range of other fifth grade students." (<u>Id</u>. at 101-02).

The August 25, 2014, IEP also provides that "Access to Electronic Textbooks," specifically Bookshare; access to the software for Read2go and Write10; and "Access to I-pod" to "access software" would be provided "As Needed x Daily." (Dist. Ex. 12 at pp. 103-4).

       G.    <u>IHO and SRO Decisions</u>

By due process complaint notice dated October 28, 2014, Parents asserted the District failed to offer J.G. a FAPE for the 2012-2013, 2013-2014, and 2014-2015 school years. (IHO Ex. 1). By letter dated November 21, 2014, the District responded to the due process complaint. (IHO Ex. 2). An Impartial Hearing Officer ("IHO") was appointed, and he held an initial conference on November 13, 2014. Beginning on January 7, 2015, the parties participated in eleven days of proceedings before the IHO, at which five witnesses testified for the District and six witnesses testified for Parents.

By Decision and Order on Statute of Limitations dated July 6, 2015, the IHO determined that Parents' claims relating to the 2012-2013 school year were "barred by the applicable two-year Statute of Limitations" and dismissed those claims. (IHO Ex. 12).

By Decision and Order dated August 19, 2015, the IHO held that the District had offered J.G. a FAPE for the 2013-2014 and 2014-2015 school years, and denied Parents' request for tuition reimbursement. By Notice of Intention to Seek Review dated September 2, 2015, Parents petitioned for review of the IHO's decision by an SRO. On September 21, 2015, Parents submitted a memorandum of law in support of their petition for review with the SRO. The District answered on October 1, 2015.

By Decision dated October 27, 2015, the SRO affirmed the IHO's determination that J.G.

received a FAPE in 2013-2014 and 2014-2015, but reversed and remanded to the IHO the

portion of its decision finding that the claims relating to the 2012-2013 school year were time

barred.

## DISCUSSION

I.    Applicable Legal Standards

Motions for summary judgment usually resolve IDEA cases in federal court.  See Viola

v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  Unlike in an ordinary

summary judgment motion, the existence of a disputed issue of material fact will not necessarily

defeat the motion.  Id.  Rather, summary judgment in the IDEA context functions as an appeal

from an administrative decision.  T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252

(2d Cir. 2009).

In a review action pursuant to the IDEA, the Court (i) reviews the record of the

administrative proceedings; (ii) hears additional evidence at the request of a party; and

(iii) grants such relief as it deems appropriate based on the preponderance of the evidence.  20

U.S.C. § 1415(i)(2)(C).

The standard of review for IDEA cases has been characterized as "modified de novo."

M.R. v. South Orangetown Cent. Sch. Dist., 2011 WL 6307563, at *6 (S.D.N.Y. Dec. 16, 2011).

Although the Court must engage in an independent review of the record and make a

determination based on a preponderance of the evidence, its review of state administrative

decisions is limited.  See Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458

U.S. at 205-06; Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 129.  The Second Circuit has

cautioned the IDEA requires "substantial deference to state administrative bodies on matters of

educational policy." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005).  Thus, the court must be mindful "that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 129 (quotation omitted), and should not "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206.  "Deference is particularly appropriate" when the SRO's review has been "thorough and careful." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 129.

As the Second Circuit clarified in M.H. v. New York City Department of Education, "the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role."  685 F.3d 217, 244 (2d Cir. 2012).  Courts should afford more weight to SRO determinations when they involve the substantive adequacy of an IEP.  Id. (citing Cerra v. Pawling Cent. Sch. Dist., 427 F.3d at 195). The Court also affords more deference to the SRO when the decision is "grounded in thorough and logical reasoning" and when the Court's "review is based entirely on the same evidence as that before the SRO."  Id.

II.   Procedural and Substantive Adequacy of J.G.'s May 23, 2013, IEP

To decide whether an IEP complies with the IDEA, courts follow a two-part test.  See Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206-07.  The first prong examines the procedural adequacy of the IEP, asking "whether the state has complied with the procedures set forth in the IDEA." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 190 (2d Cir. 2012) (quoting Cerra v. Pawling Cent. Sch. Dist., 427 F.3d at 192).  Procedural violations entitle parents to reimbursement if they "impede[] the child's right to a [FAPE]," "significantly

impede[] the parents' opportunity to participate in the decisionmaking [sic] process regarding the provision of a [FAPE] to the parents' child," or "cause[] a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

The second prong of the test weighs the substantive adequacy of the IEP by asking whether it was "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 207.  However, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential." Id. at 199.

As the Supreme Court very recently clarified, "[t]he IEP must aim to enable the child to make progress." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. __, 2017 WL 1066260, at *2 (U.S. Mar. 22, 2017).  Moreover, "for most children, a FAPE will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade." Id. at *11.

"Substantive inadequacy automatically entitles the parents to reimbursement as long as the parents' alternative placement was appropriate and equitable considerations favor reimbursement." T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 160-61 (2d Cir. 2014) (internal quotations and citations omitted).

A.     Procedural Adequacy

Parents do not contest the procedural adequacy of the IEPs in question, and the Court, having carefully reviewed the record, finds no issue with the procedures followed by the CSE in developing the 2013-2014 and 2014-2015 school year IEPs for J.G.

B.    Substantive Adequacy[4]

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 2017 WL 1066260, at *10.  "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal."  Id. (citing Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206-07).  "The IEP must aim to enable the child to make progress.  After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement."  Id.

Parents make several arguments in support of their claim that the May 2013 IEP was substantively inadequate.  The Court will address each of Parents' arguments in turn.

1.    District Programs

First, Parents argue the District's program for the 2013-2014 school year was "not reasonably calculated to address J.G.'s decoding deficit," and that the record did not support the SRO's conclusion to the contrary.  (Parents' Br. at 7).

The Court disagrees.

---

[4]    In addition to the arguments addressed below, Parents also argue the SRO applied the incorrect legal standard with respect to the May 23, 2013, IEP for the 2013-2014 school year because it analyzed whether the District had failed to implement the IEP, rather than whether the IEP was substantively adequate. (Parents' Br. at 3).  Any such error is harmless, as the SRO concluded both that the "district's program was designed to help the student become a more proficient reader and addressed the student's deficits in decoding and encoding, as well as reading fluency, comprehension, and written expression," (SRO Decision at 19), and that the "evidence supports the IHO's finding that the student made progress during the 2013-14 school year."  (SRO Decision at 23).  Thus, the SRO did find, in sum and substance, that the May 2013 IEP was substantively adequate, in addition to appropriately implemented.

Parents argue the provision of ten hours per week of ICT and two and a half hours per week of "Resource Room" services were "physical placements . . . not programs," and that they did not "address J.G.[']s decoding deficit." (Parents' Br. at 5). They further argue the "'special seating, refocusing, redirection, checks for understanding, and repeated directions,'" highlighted in the SRO decision "apply to almost any child with ADHD, but do not address decoding or encoding deficits." (Id.).

However, the record shows these assertions are incorrect. For one, and most significantly, the time in the Resource Room was used to work on J.G.'s reading and writing. Ms. Kilcrease, a special education teacher and one of J.G.'s fourth grade teachers, testified the Resource Room "part of the day was dedicated to working on decoding and encoding skills," (Tr. at 312), and the "focus" of the Resource Room time was "to address his decoding and encoding." (Tr. at 355). Moreover, the record shows that the provision of ICT time—during which J.G. was integrated into the regular classroom, and there was both a "regular education teacher and a special education teacher in the same room at the same time," (Tr. at 272-73)—was intended to provide a "level of support . . . supplemental in nature . . . to provide instruction and support based on the goals on the IEP," which included goals in reading and writing. (Tr. at 57). Likewise, the May 23, 2013, IEP notes that the special seating was recommended because J.G. "need[ed] close proximity to reduce distractions." (Dist. Ex. 9 at 66). As a result, contrary to Parents' assertions, it is apparent from the record that the programs implemented for J.G. were suggested and implemented primarily, if not exclusively, in an effort to improve J.G.'s decoding and encoding skills.

Parents also argue J.G.'s progress, or lack thereof, further shows the District's programs were insufficient under the circumstances. Specifically, they argue although J.G.'s 2013-2014

"progress report indicates that J.G. attained the goal of reading 80% of words successfully . . . the progress report is silent on what types of words J.G. could decode, and whether his decoding showed any measurable progress." (Parents' Br. at 5). In addition, they argue with respect to "J.G.'s 2013-14 second marking period progress report," from January 2014, that (i) because it "concedes that he was 'using the context of his reading to recognize some of these words more quickly,'" (Id. (quoting Dist. Ex. 56 at 268)), this means J.G. was "not actually phonetically decoding the words in question, but was guessing them from context," (Parents' Br. at 5), and that (ii) the progress report shows "poor progress in spelling." (Id. at 6 (citing Dist. Ex. 56 at 270)).

However, based on its review of the record, the Court concludes the IHO and the SRO properly found J.G. did make progress both in decoding and in reading during the 2013-2014 school year and that his progress was not trivial. In particular, as the SRO noted, "the student's progress report for the 2013-14 school year shows that the student achieved three of the 11 annual goals set out for him at the beginning of the year." (SRO Decision at 22 (citing Dist. Ex. 56 at 266-72)). Moreover, "[t]he progress report indicated that the student achieved annual goals which involved decoding a list of multi-syllabic words, answering comprehension questions related to a story that required inferencing, and composing a paragraph of seven sentences." (Id. (citing Dist. Ex. 56 at 268-70)). The SRO listed multiple ways in which the evidence shows progress. (SRO Decision at 22-23). Moreover, as the IHO pointed out, it was "undisputed that the child was promoted from 4th to 5th grade and, except for his reading level, he did perform at grade level." (IHO at 29). Ultimately, the record and decisions below confirm that even though J.G. was noted as "progressing inconsistently" in the area of writing, this is insufficient to conclude the IEP for the 2013-2014 school year was inadequate.

Accordingly, in light of the evidence and the IHO and SRO's determinations, the Court concludes the District programs in place for J.G. for the 2013-2014 school year were tailored to meet J.G.'s needs in decoding, encoding, reading, and writing, that they were reasonably calculated to enable J.G. to receive educational benefits, and that he did receive such benefits.

2.    Research-Based Programs and the Wilson Reading System

Parents further argue the District's program was not "based on peer-reviewed research," as required by the IDEA.  (Parents' Br. at 7 (citing 34 C.F.R. § 300.320(a)(4))).   They argue the District did not provide the Wilson Reading System with fidelity and that the District offered no acceptable alternative to Wilson.  (Parents' Br. at 8-10; Reply at 7).

The Court rejects this argument as both factually inaccurate and unsupported by the record.

First, the record shows the District was using a research-based approach to help J.G. progress in decoding and reading more generally.  In particular, J.G.'s teachers in the Resource Room used a "balanced literacy" program, which is a "research-based," and made of "different components such as shared reading, interactive read aloud, independent reading, word study, and also the writer's workshop."  (Tr. at 904; see also Tr. at 546).  When asked what she meant by "research-based," one of the Resource Room teachers testified, "[t]here are several researchers out there, Fountas & Pinnell, Lucy Hawkins, Fitzgerald, researchers that promote the balanced literacy approach and the components of it."  (Tr. at 904).  The SRO noted the same: "[t]he Resource Room teacher and the special education teacher both testified that this approach was supported by a substantial amount of research that demonstrated the efficacy of the program for students."  (SRO Decision at 19 (citing Tr. at 543, 903-04)).

Second, the record shows the District <u>was</u> using the Wilson method as part of its balanced literacy program.  Ms. Kilcrease testified she incorporated elements of Wilson in her instruction. (Tr. at 302-04).  She also testified she took a course with Diana King of Kildonan, who "instructed [her] with Orton-Gillingham" methodology.  (Tr. at 303).  The Wilson program is a brand-name version of the Orton-Gillingham method.  (Parents' Br. at 9, n.2).  In addition, Ms. Kilcrease testified that in the Resource Room, "the majority of the time [she used] Wilson."  (Tr. at 357).  Ms. Maiello, another special education teacher at Beekman Elementary, testified similarly.  When asked what she does "in the resource room to support children who have similar profiles as to that of" J.G., Ms. Maiello said she "[m]ostly" follows "the Wilson Reading System and other multi-sensory approaches."  (Tr. at 908-09).  When asked what parts of Wilson she used, she responded "the decoding, encoding, the fluency, the vocabulary and comprehension components."  (Tr. at 912).

Parents argue the District should have been using Wilson "with fidelity" or "exclusively." (Parents' Br. at 8-10; Reply at 7).  However, there is no requirement that any particular methodology be used, or that it be used exclusively.  <u>See</u>, <u>e.g.</u>, <u>K.L. ex rel. M.L. v. N.Y. City Dep't of Educ.</u>, 530 F. App'x 81, 86 (2d Cir. 2013) (summary order) (rejecting the argument that an IEP was "substantively deficient because it did not mention evaluative methods or a particular teaching methodology").  Moreover, Ms. Kilcrease testified that "based on [her] professional experience," Wilson should not have been used exclusively for J.G. because he "benefited from the balanced literacy program or from the other components."  (Tr. at 359-60).  The IHO and SRO both found this testimony persuasive, and the Court agrees.  (<u>See</u> IHO Decision at 28; SRO decision at 19).

Based on the testimony and evidence, the IHO and SRO both concluded the District's methods were sufficient to give J.G. a FAPE.  In particular, the IHO found that "[t]he record in this case does not justify a holding that absent a complete and exclusive application of the 'Wilson' methodology for a child with a learning disability such as dyslexia, the child cannot progress in learning to read."  (IHO Decision at 28).  The IHO went on to write, "[t]he teachers employed by the District who testified in this proceeding are all professionally trained and certified in the area in which they teach.  None of them testified that they believed that the child could not benefit at all from instruction unless he received excusive application of the 'Wilson' Method of instruction."  (IHO Decision at 28).

The IHO added:

> While the philosophy of the Kildonan School apparently is that a child with Dyslexia requires exclusive and strict application of the Orton-Gillingham method for reading instruction, and the Parents' witness, Dr. Thomas, testified that she believes that the program at Kildonan is 'appropriate' and will remediate the child's decoding deficit, neither the State Education Department, nor any of the witnesses who testified alleged that the 'Wilson' or Orton-Gillingham methodology is the only way to teach a learning disabled to read.

(IHO Decision at 28).

In addition, the SRO held, "a review of the hearing record reveals that the district used multisensory teaching approaches in providing the student with instruction to meet his needs in reading, decoding, and encoding."  (SRO Decision at 21).

Accordingly, in light of the evidence in the record and the IHO and SRO's determinations below, the Court concludes the May 2013 IEP did not have to require the use of Wilson with fidelity, that the IEP incorporated methods tailored to J.G. and to ensure his advancement, and that the methods used were research-based and adequate to ensure J.G.'s progress in his educational areas of difficulty.

3.     Progress in the Fourth Grade

Parents next argue the District's reading assessment did not test J.G.'s progress in phonetic decoding, that teacher-made assessments show no progress in decoding, and that objective tests show J.G. made no meaningful progress in decoding.  (Parents' Br. at 13-18; Reply at 5-6).  Among other things, Parents allege that according to the Fountas & Pinnell reading inventory, which measures a student's reading abilities, J.G. ended the third grade "reading at a Level N," and at the end of the fourth grade, "J.G. again tested at Level N." (Parents' Br. at 15).  They state this shows J.G. made no progress.

However, as the IHO and SRO noted, other evidence in the record shows J.G. did make progress in reading and decoding in the fourth grade.  Ms. Kilcrease testified that by the end of the 2013-2014 academic year, J.G. "was reading a book *Don't Make Me Smile* that is actually a book that many fourth graders read at the beginning of the year," i.e., above a Level N.   (Tr. at 340).  Ms. Kilcrease also testified that J.G.'s Fourth Grade Progress Report shows that by the end of the 2013-2014 school year J.G. was "maintaining or increasing his skills."  (Tr. at 505).  In addition, Ms. Rifenburg, who co-taught J.G.'s fourth grade class with Ms. Kilcrease, testified that J.G. had regressed over the summer 2013, meaning he did not start the 2013-2014 school year at a level N.  In particular, when asked why the CSE recommended extended school year services for J.G., Ms. Rifenburg testified "[b]ecause you always worry about regression over the summer," and with respect to J.G., she said "[e]ven from the end of third grade to fourth grade, he had regressed a bit, so we wanted to make sure that wasn't going to happen again."  (Tr. at 740).  Therefore, J.G. began the fourth grade year below an N level, and progressed back to at least an N level.  Moreover, Ms. Rifenburg testified J.G. was in fact reading a Level O or P book in the fourth grade.  (Id. at 703-04).

Accordingly, the Court agrees with the SRO and IHO that the evidence and testimony in the record shows J.G. made progress in the fourth grade in his areas of academic difficulty.

III.   Application for Tuition Reimbursement for 2014-2015 School Year

Parents next contend they are entitled to tuition reimbursement for placing J.G. at Kildonan for the 2014-2015 school year because the District's IEP for that year did not offer J.G. a FAPE.  (Parents' Br. at 18).

Claims for tuition reimbursement are "governed by the Burlington/Carter Test, which looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities."  C.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 76 (2d Cir. 2014); see generally Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. at 369; Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12 (1993).

Parents contend the SRO "did not grapple with or even consider the evidence supporting" Parents' arguments with respect to the 2014-2015 IEP.  (Parents Br. at 20).

The Court disagrees.

Both the IHO and the SRO went to great lengths to address Parents' arguments.  (See SRO Decision at 21-22).  In fact, the IHO spent twelve pages—out of a thirty-page decision— summarizing the testimony of Parents' witnesses.  (IHO Decision at 12-24).

Moreover, largely for the reasons stated in the SRO's decision, the Court rejects Parents' arguments and agrees with the SRO's conclusion that "the evidence in the hearing record shows that the August 2014 CSE made a number of changes and additions to the student's IEP designed to address the student's identified needs and were reasonably calculated to provide the student with educational benefit."  (SRO Decision at 21-22).  In addition, as the SRO noted, "the hearing

22

record shows that the student's needs were consistent with those depicted in the May 2013 IEP

with the exception of a few changes, which . . . were appropriately addressed by the August 2014

CSE." (SRO Decision at 23).   Moreover, the Court agrees that "the changes to the student's IEP

for the 2014-15 school year . . . contradict the parents' argument that the August 2014 IEP was

the same as for the 2013-14 school year." (SRO Decision at 25).  The Court therefore also

agrees with the SRO conclusion on this point:

> [T]he evidence in the hearing record supports a finding that the August 2014
> IEP—including its continuation of ICT services in a general education setting and
> two hours and 30-minutes per week of resource room services, along with
> recommendations for a 12-month program, AT programs and services, and social
> work consultation services—was appropriate to meet the student's needs and
> reasonably calculated to enable the students to receive an educational benefit.

(SRO Decision at 25).

Accordingly, in light of the evidence and the IHO and SRO's determinations below, the

Court concludes the proposed IEP for the 2014-2015 school year would have provided J.G. with

a FAPE.

Because the Court concludes the District's 2014-2015 IEP was substantively adequate,

the Court need not address the appropriateness of Parents' placement of J.G. at Kildonan or any

equitable considerations weighing in Parents' favor.  See, e.g., Cerra v. Pawling Cent. Sch. Dist.,

427 F.3d 186, 192 (2d Cir. 2005).

IV.   Parents' Expert

Parents further argue the SRO erred in affirming the IHO's decision not to consider the

expert testimony of their neuropsychological expert, Dr. Thomas, because she did not provide

input in the CSE.  Parents argue the information provided by Dr. Thomas was not "unavailable"

to CSE because it was the type of information—a description of a remedial reading program—

that the CSE is charged with possessing.  (Reply at 3).  They also argue the District opened the

door for Dr. Thomas's testimony by introducing after-the-fact opinion testimony that the IEPs

met J.G.'s needs.  They argue they had the right to rebut these opinions.

  The Court disagrees.

  "[A] substantively appropriate IEP may not be rendered inadequate through testimony

and exhibits that were not before the CSE about subsequent events and evaluations that seek to

alter the information available to the CSE."  C.L.K. v. Arlington Sch. Dist., 2013 WL 6818376,

at *13 (S.D.N.Y. Dec. 23, 2013).

  Here, "there is no evidence in the hearing record that the neuropsychological evaluation

report was provided to the CSE at or prior to the August 2014 CSE meeting, nor did the private

evaluator who conducted the neuropsychological evaluation attend any of the disputed CSE

meetings."  (SRO Decision at 25 (citing IHO Decision at 29)).

  Moreover, the evidence shows the CSE was uniformly receptive to the Parents' concerns

and open to amending the IEPs to address concerns raised by them.  (See CSE meeting notes,

Dist. Exs. 9-12).  Stated another way, had the CSE had access to Dr. Thomas's report, there is no

reason to believe it would have rejected any new suggestions contained therein.  But Parents did

not give the CSE or the District a chance to consider any additional concerns or

recommendations raised by the neuropsychological evaluation.

  The Court agrees with the IHO and SRO in all respects on this point, including that the

CSE should consider Dr. Thomas's test results and evaluation to the extent it is helpful in

developing future IEPs.  (See SRO Decision at 26).

  In sum, while the Court is sympathetic to Parents' concern that their child was entering

the fifth grade and still having difficulty reading and writing, the overwhelming evidence

confirms, consistent with the decisions of both the IHO and SRO below, that the District

provided J.G. with a FAPE and that both the 2013-2014 and 2014-2015 IEPs were substantively adequate.

V.      Rehabilitation Act and ADA Title II Claims

        In their complaint, Parents also sought for relief under the Rehabilitation Act of 1974 and Title II of the Americans with Disabilities Act.  (See Compl. ¶¶ 277-286).  However, Parents did not brief either issue before this Court.  The Court therefore deems any such argument abandoned.  Moreover, even had they been properly briefed, largely for the reasons stated in the District's memorandum of law (Def.'s Br. at 21-22), both claims fail as a matter of law.  In particular, Parents have not argued or demonstrated that J.G. was excluded from any programs, denied benefits, or otherwise discriminated against on the basis of his disability.  See D.C. ex rel. E.B. v. N.Y. City Dep't of Educ., 950 F. Supp. 2d 494, 518 (S.D.N.Y. 2013).

**CONCLUSION**

        Plaintiffs' motion for summary judgment is DENIED.

        The Court affirms the decision of the SRO and dismisses the complaint.

        The Clerk is instructed to terminate the motion (Doc. #17) and close this case.

Dated: March 29, 2017
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge